FILED IN OPEN COURT

4-15-2021

CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

CASE NO. 3:20-cr-151(S1)-BJD-JBT

v.

FRANCISCO ENRIQUE GONZALEZ BENITEZ
a/k/a "Antonio Jose Estremera Feliciano"
a/k/a "Paco"

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Karin Hoppmann, Acting United States Attorney for the Middle District of Florida, and the defendant, FRANCISCO ENRIQUE GONZALEZ BENITEZ, and the attorney for the defendant, Jeremy Lasnetski, mutually agree as follows:

### A.   **Particularized Terms**

1.   **Counts Pleading To**

The defendant shall enter a plea of guilty to Counts One, Two, and Three of the Information.  Count One charges the defendant with conspiracy to possess with intent to distribute and to distribute controlled substances, including one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).  Count Two charges the defendant with conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i).  Count Three

Defendant's Initials _F.GB_                                    AF Approval _BL_

charges the defendant with attempted distribution, and aiding and abetting the attempted distribution, of 50 grams or more of actual methamphetamine, a Scheduled II controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and 18 U.S.C. § 2.

2. **Mandatory Minimum and Maximum Penalties**

Counts One and Three are each individually punishable by a mandatory minimum term of imprisonment of 10 years, a maximum term of life imprisonment, a fine of not more than $10,000,000, or both imprisonment and fine, a term of supervised release of not less than 5 years, and a mandatory special assessment of $100 due on the date of sentencing. A violation of the terms and conditions of supervised release carries a maximum sentence of not more than 5 years' imprisonment, as well as the possibility of an additional term of supervised release.

Count Two is punishable by a term of imprisonment of not more than 20 years, a fine of not more than $500,000 or twice the value of the property involved in the offense, whichever is greater, or both imprisonment and a fine, a term of supervised release of not more than 3 years, and a mandatory special assessment of $100 due on the date of sentencing. A violation of the terms and conditions of supervised release carries a maximum sentence of not more than 2 years' imprisonment, as well as the possibility of an additional term of supervised release.

Defendant's Initials _F.G.B_                    2

The cumulative penalties for Counts One, Two and Three are a mandatory minimum term of imprisonment of 10 years, a maximum of two life terms plus 20 years' imprisonment, a fine of not more than $20,500,000 or $20,000,000 plus twice the value of the property involved in the money laundry offense, whichever is greater, or both imprisonment and fine, a term of supervised release of not less than 5 years, and a mandatory special assessment of $300 due on the date of sentencing. A violation of the terms and conditions of supervised release carries a maximum sentence of not more than 12 years' imprisonment, as well as the possibility of an additional term of supervised release.

Further, because the defendant is not a United States citizen, he may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

3.    **Elements of the Offenses**

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty. Specifically:

**Elements of Count One**

> One:    two or more people in some way agreed to try to accomplish a shared and unlawful plan to possess with intent to distribute and to distribute controlled substances, including cocaine, heroin, fentanyl, marijuana, and methamphetamine;
>
> Two:    the defendant knew the unlawful purpose of the plan and

Defendant's Initials *F.G.B*                    3

willfully joined in it; and

Three:   an object of the unlawful plan was to possess with the intent to distribute and to distribute one kilogram or more of heroin.

### Elements of Count Two

One:   two or more people agreed to try to accomplish a common and unlawful plan to violate 18 U.S.C. § 1956(a)(1)(B)(i); and

Two:   the defendant knew about the plan's unlawful purpose and voluntarily ~~voluntarily~~ joined in it.

*[handwritten annotations: voluntarily / willfully / F.G.B. MC]*

### Elements of Count Three

One:   the defendant intentionally attempted to distribute, or aided and abetted an attempt to distribute, methamphetamine;

Two:   the defendant took a substantial step toward the distribution of methamphetamine; and

Three:   the attempted distribution involved 50 grams or more of actual methamphetamine.

4.   **Apprendi v. New Jersey**

Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), a minimum sentence of 10 years' imprisonment and a maximum sentence of life imprisonment may be imposed as to Count One because the following facts have been admitted by the defendant and are established by this plea agreement:  the quantity of heroin involved in the conspiracy was one kilogram or more.  Further, under *Apprendi*, a minimum sentence of 10 years' imprisonment and a maximum sentence of life

Defendant's Initials *F.G.B*                    4

imprisonment may be imposed as to Count Three because the following facts have been admitted by the defendant and are established by this plea agreement: the quantity of actual methamphetamine involved in the attempted distribution was 50 grams or more.

5.     **Indictment Waiver**

The defendant agrees to be charged by the information and will waive the right to be charged by way of indictment before a federal grand jury.

6.     **Count Dismissed**

At the time of sentencing, Count One of the indictment will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

7.     **Acceptance of Responsibility - Three Levels**

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement,

Defendant's Initials _F.G. B_                    5

including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8.      **Cooperation - Substantial Assistance To Be Considered**

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable

Defendant's Initials _E.G.B_                    6

guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b).  In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.     **Use of Information - Section 1B1.8**

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

10.     **Cooperation - Responsibilities of Parties**

a.     The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other

Defendant's Initials _F.L.B_                    7

mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

        b.     It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

        (1)     The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

        (2)     The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those

Defendant's Initials *F.G. B*        8

offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set

Defendant's Initials _F.G.B._                9

forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

12. **Forfeiture of Assets**

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. § 853 and 18 U.S.C. § 982(a)(1), whether in the possession or control of the United States, the defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from the judgment, the defendant

Defendant's Initials _F. G. B._                    10

agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant further agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of

Defendant's Initials _F. L. B._          11

a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

**B.     Standard Terms and Conditions**

       1.     **Restitution, Special Assessment and Fine**

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any

Defendant's Initials _FLB._                    12

victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

2. **Supervised Release**

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

Defendant's Initials _F.G.S._                13

3.    **Immigration Consequences of Pleading Guilty**

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    **Sentencing Information**

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    **Financial Disclosures**

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or

Defendant's Initials _F,C,B._                14

indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    **<u>Sentencing Recommendations</u>**

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court,

Defendant's Initials _БСиБ._                    15

with the assistance of the United States Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.   **Defendant's Waiver of Right to Appeal the Sentence**

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then

Defendant's Initials _F̶b̶B̶._        16

the defendant is released from his waiver and may appeal the sentence as authorized

by 18 U.S.C. § 3742(a).

8.    **Middle District of Florida Agreement**

It is further understood that this agreement is limited to the Office of the

United States Attorney for the Middle District of Florida and cannot bind other

federal, state, or local prosecuting authorities, although this office will bring

defendant's cooperation, if any, to the attention of other prosecuting officers or

others, if requested.

9.    **Filing of Agreement**

This agreement shall be presented to the Court, in open court or in

camera, in whole or in part, upon a showing of good cause, and filed in this cause, at

the time of defendant's entry of a plea of guilty pursuant hereto.

10.    **Voluntariness**

The defendant acknowledges that defendant is entering into this

agreement and is pleading guilty freely and voluntarily without reliance upon any

discussions between the attorney for the government and the defendant and

defendant's attorney and without promise of benefit of any kind (other than the

concessions contained herein), and without threats, force, intimidation, or coercion

of any kind.  The defendant further acknowledges defendant's understanding of the

nature of the offense or offenses to which defendant is pleading guilty and the

elements thereof, including the penalties provided by law, and defendant's complete

Defendant's Initials _F.G.B ._                    17

satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial.  The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.    **Factual Basis**

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and

Defendant's Initials _E.L.B_                18

were this case to go to trial, the United States would be able to prove those specific

facts and others beyond a reasonable doubt.

12.   **Entire Agreement**

This plea agreement constitutes the entire agreement between the

government and the defendant with respect to the aforementioned guilty plea and no

other promises, agreements, or representations exist or have been made to the

defendant or defendant's attorney with regard to such guilty plea.

13.   **Certification**

The defendant and defendant's counsel certify that this plea agreement

has been read in its entirety by (or has been read to) the defendant and that defendant

fully understands its terms.

DATED this _7th_ day of April 2021.

KARIN HOPPMANN
Acting United States Attorney


_____
FRANCISCO GONZALEZ BENITEZ
Defendant

_____
MICHAEL J. COOLICAN
Assistant United States Attorney


_____
JEREMY LASNETSKI
Attorney for Defendant

_____
FRANK M. TALBOT
Assistant United States Attorney
Chief, Jacksonville Division



Defendant's Initials _F.G.B_                    19

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA                    CASE NO. 3:20-cr-151(S1)-BJD-JBT

      v.

FRANCISCO ENRIQUE GONZALEZ BENITEZ
  a/k/a "Antonio Jose Estremera Feliciano"
  a/k/a "Paco"

## PERSONALIZATION OF ELEMENTS

**As to Count One:**

      1.    Do you admit that beginning no later than in or about September 2016, and continuing through on or about February 22, 2019, in the Middle District of Florida, you and at least one other person in some way agreed to try to accomplish a shared and unlawful plan to possess with intent to distribute and to distribute controlled substances, including methamphetamine, cocaine, heroin, fentanyl, and marijuana?

      2.    Did you know the unlawful purpose of the plan and willfully joined in it?

      3.    Was an object of the unlawful plan to possess with the intent to distribute and to distribute one kilogram or more of heroin?

Defendant's Initials _F.G.B._

**As to Count Two:**

        1.     Do you admit that beginning no later than in or about November 2016, and continuing through on or about November 28, 2018, in the Middle District of Florida, you and at least one other person agreed to try to accomplish a common and unlawful plan to violate 18 U.S.C. § 1956(a)(1)(B)(i), that is, to conduct financial transactions that you knew involved the proceeds of drug trafficking conspiracy charged in Count One in an manner designed to conceal and disguise the nature, source, ownership, and control of the drug proceeds?

        2.     Did you know the plan's unlawful purpose and voluntarily joined in it?

**As to Count Three:**

        1.     Do you admit that on October 30, 2020, you intentionally attempted to distribute, and aided and abetted an attempt to distribute, methamphetamine into the Middle District of Florida?

        2.     Do you admit that you took substantial steps toward distributing methamphetamine, including coordinating with the intended recipient through electronic messages and causing the methamphetamine to be shipped to the Middle District of Florida?

        3.     Do you admit that the attempted distribution involved 50 grams or more of actual methamphetamine?

Defendant's Initials *FiG,B*        2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA                    CASE NO. 3:20-cr-151(S1)-BJD-JBT

v.

FRANCISCO ENRIQUE GONZALEZ BENITEZ
   a/k/a "Antonio Jose Estremera Feliciano"
   a/k/a "Paco"

## **FACTUAL BASIS**

Beginning no later than in or about September 2016, and continuing through on or about February 22, 2019, Francisco Enrique Gonzalez Benitez, also known as "Paco" and also known as "Antonio Jose Estremera Feliciano" (the defendant), supplied and operated with others an illegal drug distribution ring in Jacksonville, Florida, and facilitated surreptitious payments to their source of drugs in California.

In September 2017, a U.S. Postal Inspector obtained federal warrants to search four parcels mailed from Southern California to four residences in Jacksonville, Florida. The four residences were located on Deermoss Way, Baymeadows Circle, Fox Tail Lane, and Old Kings Road. The parcels addressed to the residences on Deermoss Way, Fox Tail Lane, and Old Kings Road each contained approximately one kilogram of cocaine. The Deermoss Way parcel contained packaging material on which investigators located three latent fingerprints. Those fingerprints match to the known fingerprint card of the defendant.

Defendant's Initials _F.B.G._

The parcel addressed to the Baymeadows Circle residence contained approximately six pounds of marijuana and one kilogram of crystal methamphetamine.  Laboratory testing later showed that there were 895.8 grams of methamphetamine that was 99% actual or pure methamphetamine.

The postal inspector seized these four parcels and their contents, and did not deliver them.  On September 19, 2017, as captured by surveillance video and reported by post office personnel, an individual (Co-Conspirator 1) went to a post office in Jacksonville to ask about the whereabouts of the parcel addressed to the Fox Tail Lane residence.  Co-Conspirator 1 lived in Jacksonville with an individual (Co-Conspirator 2) who was a younger family member of the defendant, but not specifically at the Fox Tail Lane residence.  Postal service and telephone company records also establish that an individual called the postal service to inquire about that same parcel; the phone number used to make that call was registered to Co-Conspirator 2.  Postal records establish that between October 2016 and September 2017, the postal service delivered 28 parcels from Southern California to the Fox Tail Lane address and that those parcels were generally similar in size and weight as the intercepted parcel that had been mailed to the Fox Tail Lane residence and contained a kilogram of cocaine.

Co-Conspirators 1 and 2 are listed in a filing with the State of Florida as the sole officers of a limited liability company, Mudsuddz, LLC.  In that filing, the LLC's principal office is listed as the residence referenced above on Deermoss Way.

Defendant's Initials _F, G, B._                    2

Co-Conspirator 2 previously provided that same address when obtaining his Florida driver's license.  Postal records establish that between October 2016 and September 2017, the postal service delivered 33 parcels from Southern California to the Deermoss Way address and that those parcels were generally similar in size and weight as the intercepted parcel referenced above that had been mailed to the Deermoss Way residence and that contained the kilogram of cocaine.

State of Florida records establish that the defendant obtained a driver's license using a false name, Antonio Jose Estremera Feliciano.  In September 2017, the utilities for the Old Kings Road residence listed above were in the name of that alias. Postal records establish that between February 2016 and September 2017, the postal service delivered 12 parcels from Southern California to the Old Kings Road address and that those parcels were generally similar in size and weight as the intercepted parcel intended for that address that contained the kilogram of cocaine.

Like the utilities for the Old Kings Road residence, the lease for the Baymeadows Circle residence referenced above was in the name of that same alias. Again, that residence was the intended delivery location for approximately six pounds of marijuana and one kilogram of crystal methamphetamine.

The postal service permits the public to track certain parcels using its website. Investigators have obtained certain records that show the internet protocol (or IP) addresses used by individuals accessing the postal service's website to track parcels. In September 2017, one IP address was used to track parcels from Southern

Defendant's Initials _F.G.B_                    3

California scheduled for delivery to the home of Co-Conspirators 1 and 2 and the four residences located on Deermoss Way, Baymeadows Circle, Fox Tail Lane, and Old Kings Road, including the parcel addressed to the Fox Tail Lane residence that was intercepted and found to contain a kilogram of cocaine. A second IP address was used to track that same parcel, but also parcels sent to the home of Co-Conspirator 1 and 2, and to a Jacksonville business located on Beach Boulevard where Co-Conspirator 1 sometimes worked. Postal records establish that between October 2016 and September 2017, the postal service delivered 6 such parcels to Co-Conspirator 1 and 2's home and 21 such parcels to the Beach Boulevard business. Again, those parcels were mailed in Southern California and were generally similar in size and weight as the intercepted parcels that contained cocaine, methamphetamine, and marijuana.

In total, the Postal Inspection Service estimates that between September 2016 and September 2017, 106 parcels that fit the profile of a package containing controlled substances were delivered to the co-conspirators' residence and the other locations described above. Records establish that those parcels weighed a total of 618.5 pounds (including packaging).

Co-Conspirator 2 maintained a personal bank account and related records show that its primary source of funding were cash deposits. Between February 28, 2017 and July 3, 2018, there were 49 ATM cash deposits into that account, made at various locations in the Jacksonville area, totaling approximately $43,477.00.

Defendant's Initials _F/C.B_                4

Between February 27, 2017 and February 27, 2018, there were 14 branch teller cash deposits conducted at various locations in Jacksonville, totaling approximately $46,605.00.  Between March 30, 2017 and June 19, 2018, the account was used at various branch locations in Jacksonville to make 29 cash exchanges totaling $174,290.00, converting small denominations of bills to larger ones.  (It is easier to bulk transport or mail a significant amount of illegal proceeds if larger denomination bills are used.)

Co-Conspirator 1 maintained a personal bank account, records of which also show a high volume of cash deposits.  Between February 28, 2017 and November 21, 2018, there were 206 ATM cash deposits into that account, made at various locations in the Jacksonville area, totaling approximately $160,752.00.  Between October 11, 2017 and December 4, 2017, there were 4 branch teller cash deposits conducted at various locations in Jacksonville, totaling approximately $17,294.00.

There is also a corporate bank account for Mudsuddz, LLC, which Co-Conspirator 2 controlled.  A review of the account records found no typical business-related banking activity, suggesting that the business is a front.  Cash deposits were the primary source of funding for the account.  Records show that between March 16, 2017 and July 9, 2018, there were 122 ATM cash deposits made at various locations in Jacksonville, totaling approximately $136,815.  Between April 4, 2017 and June 14, 2018, there were 31 cash deposits via branch teller conducted at various locations in Jacksonville, totaling approximately $108,299.

Defendant's Initials _F.L.B_                    5

Records show that on certain occasions, money was transferred electronically or via check from the bank accounts of Co-Conspirator 1 and Mudsuddz, LLC into the bank account of an entity with a Southern California address (the "California Entity"). In addition to these transactions, between November 3, 2016 and January 31, 2018, the California Entity's account received 30 cash deposits made in Jacksonville, Florida, and 3 deposits made in the State of Georgia, totaling $94,095. Bank records show that on three different occasions (twice on December 15, 2016 and once on March 14, 2017), a person in Jacksonville made $3,000 cash deposits into the California Entity account and presented Co-Conspirator 2's driver's license and a Mexican passport as identification.

Similarly, the money has been transferred electronically from the bank accounts of the Mudsuddz, Co-Conspirator 1, and Co-Conspirator 2 into the bank accounts of individuals (including the defendant) with Southern California addresses. The accounts of these same Californians also received a high volume of cash deposits made in Jacksonville. For example, between January 31, 2018 and June 4, 2018, an account under the name Antonio J. Estremera (the defendant's alias) received approximately $23,000 by way of 8 ATM deposits and 5 branch teller cash deposits, all made in Jacksonville. Between December 14, 2017 and January 25, 2018, another California-based account received approximately $15,000 by way of 7 ATM deposits and 2 branch teller cash deposits, again, all made in Jacksonville. Between December 14, 2017 and May 31, 2018, still another California account received

Defendant's Initials _F.G.B_                6

approximately $25,965 in Jacksonville cash deposits (5 ATM deposits and 2 branch teller deposits).

A financial investigator has analyzed the banking activity of this Jacksonville-California financial network.  The investigator estimates that individuals and entities in the Jacksonville-portion of the network have made approximately $416,144 in cash deposits and other transfers into the accounts of individuals and entities in the California-portion of the network.  The purpose of the corporate entities, various business and personal bank accounts, and methods of depositing and transferring cash was to distribute funds between co-conspirators while concealing the nature and sources of those funds.

On November 27, 2018, the defendant agreed to be interviewed by federal agents.  The interview took place at a hotel in Costa Mesa, California.  During the interview, the defendant admitted that in 2016, he began shipping from California heroin, cocaine, methamphetamine, and marijuana to Co-Conspirator 2 in Jacksonville, Florida.  Shipments were hidden in the mail or in vehicles that were transported on car carriers.  He also admitted that he was a source of supply of controlled substances in Little Rock, Arkansas.  Further, he stated that he obtained a drivers' license and U.S. passport in the name Antonio Estremera Feliciano.

In addition, according to the defendant, beginning in 2014, he had worked as a confidential informant with a particular DEA Special Agent, but throughout 2016 and 2017, the defendant made several cash payments to the agent in amounts as

Defendant's Initials _F.G.B._                    7

large as $9,000. These payments were for what the defendant called "top cover protection" for the defendant's drug operation. This protection included the agent advising the defendant when not to use the mail to ship controlled substances, when to change his phone number, and when he and his potential customers were under investigation by law enforcement.

On November 28, 2018, Co-Conspirator 1 was driving Co-Conspirator 2's car in Hamilton County, Florida. Co-Conspirator 2 was the only passenger in the car. A Florida Highway Patrol trooper stopped Co-Conspirator 1 for speeding. During the traffic stop, a canine trained in the detection of controlled substances alerted on Co-Conspirator's car, indicating the recent presence of controlled substances. During the search that followed, troopers located, among other things, a loaded Beretta .40 caliber handgun and several rubber-banded bundles of cash, totaling approximately $70,000.

Later that evening, after being advised of his *Miranda* rights and executing an advice of rights form, Co-Conspirator 2 agreed to speak with federal agents. Among other things, he admitted that the $70,000 were proceeds from the sale of a kilogram of heroin that he had just completed in Little Rock, Arkansas. According to Co-Conspirator 2, the defendant had supplied him with the heroin for that sale. Co-Conspirator 2 told the agents that in the past, he had received controlled substances from the defendant both in the mail and hidden in cars being transported from California via car haulers.

Defendant's Initials *F.L.B.*                8

He also stated that a DEA Special Agent (the same one identified by the defendant) had been providing information to him and the defendant to permit them to avoid arrest. Among other things, this DEA agent had told them when not to use the mail to ship drugs, when not to use telephones, and when to change their telephones. This agent also recommended that the defendant assume a new identity, which according to Co-Conspirator 2, the defendant did. Co-Conspirator 2 initially stated that he had never paid this DEA agent and did not know whether the defendant had done so. He later recanted this statement and admitted that in late 2016, at the defendant's direction, he had placed $5,000 in the mailbox of the Deermoss Way residence, and the agent had retrieved the money. He also stated that in late 2017, he made $7,000 or $8,000 available for the agent, again at Co-Conspirator 2's direction.

Later that day, with the consent of a resident, federal agents searched the home of Co-Conspirators 1 and 2. They located, among other things, $17,934.00 and 1,570.5 grams of a substance that laboratory testing later showed was fentanyl.

On February 22, 2019, police in Alabama conducted a traffic stop of a car hauler. A drug-detecting canine alerted on the truck, indicating the presence of a controlled substance. The bill of lading for one of the vehicles being transported (a Dodge Durango) listed "Antonio Feliciano" (again, an alias of the defendant) as the shipper. That bill of lading only listed "Jacksonville" as the delivery address.

Defendant's Initials _Fih B_                9

According to the driver, he had come from California and the delivery address for the Durango was in Folkston, Georgia.

The officers found no drugs and permitted the car hauler to proceed. They contacted the DEA, however, and shared the information about the car hauler. A DEA Special Agent went to the delivery site in Folkston, and while conducting surveillance, saw Co-Conspirator 2 arrive in a pickup truck.

Once the car hauler arrived at the delivery address, the driver unloaded the Durango and provided it to Co-Conspirator 2 who was alone. Minutes after the driver left the scene, an agent detained Co-Conspirator 2.

After being advised of his *Miranda* rights and signing an advice of rights form, Co-Conspirator 2 agreed to be interviewed. He also agreed orally and in writing to a search of the Durango and his pickup truck. Co-Conspirator 2 stated there were three kilograms of heroin hidden in the Durango. He stated that the defendant had loaded the drugs into the Durango in California. According to Co-Conspirator 2, he intended to sell the heroin to an individual in Jacksonville for $50,000 per kilogram.

The agents then took Co-Conspirator 2 to the Durango, where he explained how to remove the heroin. Following his instructions, agents removed heat-sealed bags containing approximately 3.6 kilograms of what appeared to be heroin. (Laboratory testing later showed that the bags contained 2,271.3 grams of heroin and 976.1 grams of fentanyl.) An agent searched the pickup truck and located a loaded Glock .45 caliber pistol.

Defendant's Initials *FLiB*                    10

In October 2020, Co-Conspirator 1 received a series of telephone calls from the defendant. The pair eventually discussed the possibility of the defendant supplying Co-Conspirator 1 with methamphetamine. Once it was confirmed that Co-Conspirator 1 would be willing to sell methamphetamine, the defendant told Co-Conspirator 1 to setup an encrypted smartphone application so that they could communicate about a deal without being traced.

Acting at the direction of law enforcement, Co-Conspirator 1 began preserving and disclosing to federal agents the defendant's encrypted communications. His encrypted communications show that the defendant set the price for the proposed deal, provided updates on when he would have methamphetamine available to ship, and described how it would be concealed, specifically, within decorative candles. The defendant's user-name on his communications was "ajef," which are the initials of his alias "Antonio Jose Estremera Feliciano."

On October 30, 2020, Co-Conspirator 1 provided federal agents with an unopened U.S. Postal Service parcel that Co-Conspirator 1 had received in the mail. The parcel was addressed not to Co-Conspirator 1, but to "T. Ramirez." Inside the parcel were two decorative candles. The candles were not solid, but contained an inner void constructed of duct tape, inside which were shards of a substance that appeared to be crystal methamphetamine. Laboratory analysis showed that the substance weighed 441.4 grams and was 97% pure or actual methamphetamine.

Defendant's Initials _F.L.B_                    11